UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,  :  MEMORANDUM AND ORDER
                           :  11-cr-805 (WFK)
-against-                  :
                           :
ISFRAIN JOSE SERRANO,      :
                           :
           Defendant.      :
                           :
-----------------------------------------------------------X

**WILLIAM F. KUNTZ II, United States District Judge**

By indictment filed December 1, 2011, Isfrain Jose Serrano ("Defendant") is charged with conspiracy to distribute cocaine and heroin, in violation of 21 U.S.C. § 846, and possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1). Defendant moves this Court pursuant to Federal Rules of Criminal Procedure 12(b)(3) and (41)(h) to suppress evidence recovered from his residence and statements made by him after his arrest. For the reasons that follow, the motion is denied.

## BACKGROUND AND FINDINGS OF FACT

This Court held a suppression hearing on October 18, 2012 and November 14, 2012 (the "Hearing"). At the Hearing, the Government presented seven witnesses: New York City Police Department ("NYPD") Lieutenant Jerry Caicedo, NYPD Detectives Jose Morales and Joshua Rosenbaum, Suffolk County Police Department ("SCPD") Detective Patrick Walsh (retired), SCPD Deputy Sheriff Sergeant Jeffrey Bolettieri, Drug Enforcement Administration ("DEA") Agent David Campbell, and Village of Hempstead Police Department Detective Michael Bornstein. Defendant did not present any witnesses.

1

Upon consideration of the motion, Hearing evidence, and post-Hearing briefing, the Court finds the following facts to be true.

**Early Investigation of Defendant**

In September 2011, Officer Bolettieri and Agent Campbell met with a cooperating witness ("CW"). Hearing Tr. at 367:2–370:22; Sealed Aff. by Jeffrey Bolettieri in Supp. of App. for Arrest Warrant and Search Warrant ("Bolettieri Aff."), at ¶ 3. At the debriefing, the CW identified Defendant as having participated in a narcotics transaction in March 2011. Hearing Tr. at 287:2–24, 369:1–11. Law enforcement agents, who had already been investigating the CW at that time and had conducted surveillance of the March 2011 transaction, confirmed that Defendant was the same person they had seen at the transaction. Hearing Tr. 287:2–24, 367:2–372:1, 425:23–427:5, 511:11–16.

The CW advised law enforcement officers that he had regularly purchased cocaine and heroin from Defendant at the Defendant's residence since 2008. *Id.* at 369:12–370:22; Bolettieri Aff. at ¶ 3. The CW also stated that he had personally observed narcotics, firearms, a kilogram press, and large quantities of cash in either Defendant's residence or the basement of the same building. Hearing Tr. at 369:12–370:22; Bolettieri Aff. at ¶ 3. Based on the CW's purchases of narcotics from Defendant and his personal observations of narcotics deliveries and sales while present in the Defendant's residence, the CW estimated Defendant sold about four or five kilograms of cocaine per week. Hearing Tr. at 428:21–429:4; Bolettieri Aff. at ¶ 3. In October and November 2011, law enforcement agents recorded conversations between the CW and Defendant in which the CW expressed interest in purchasing cocaine, heroin, and firearms, and

2

Defendant indicated that he could obtain and sell the requested narcotics to the CW.¹ Hearing Ex. 9A at 29:26–33, 31:00–20, 33:13–34:1; Bolitierri Aff. at ¶ 6.

**The Warrant Application**

On November 3, 2011, Officer Bolettieri filed an application with this Court seeking an arrest warrant for Defendant, as well as a search warrant to search Defendant's first floor apartment in Brooklyn and the basement of the premises, located at 144 Kingsland Avenue. Dkt No. 11-mj-1090, ECF No. 1. According to Officer Bolettieri's supporting affidavit, the DEA had probable cause to believe Defendant was "involved in the distribution of kilogram-quantities of cocaine and other controlled substances" and had used his residence "as his base of operations for narcotics-related activities," such as by "stor[ing] cocaine . . . for short periods of time before distributing cocaine to other co-conspirators." Bolettieri Aff. at ¶ 2.

Officer Bolettieri's affidavit relied on three pieces of evidence to establish probable cause. First, the affidavit relied on information provided by the CW regarding Defendant's drug trafficking activities, as detailed above. Bolettieri Aff. at ¶ 3. The affidavit admitted that the CW had recently been charged with conspiracy to distribute cocaine and was cooperating with the government with the hope of receiving a reduced sentence. *Id.* The affidavit also stated that information provided by the CW had proven to be reliable in the past and had been corroborated in this case by independent evidence, including recorded conversations between the CW and Defendant. *Id.*

---

¹ During the October 13 conversation between Defendant and the CW, Defendant's wife called Defendant twice to warn him about suspicious vehicles in the area and that Defendant might be under surveillance. Hearing Ex. 9A at 25:00–26:35, 29:35–54; Hearing Tr. at 167:18–168:12, 204:18–21, 407:3–8. In fact, Defendant's wife had identified the vehicle in which Officer Bolettieri and Agent Campbell were sitting. Hearing Tr. at 167:18–168:12, 375:10–376:3, 463:18–23. Shortly thereafter, Defendant's wife entered the apartment and spoke with Defendant in person about the suspicious vehicles she had observed. *Id.* at 464; Hearing Ex. 9A at 31:30–32:07. She indicated that she had seen one of the vehicles before. Hearing Ex. 9A at 32:08–21. She also stated that she had taken down the plate number of one of the vehicles. *Id.* at 32:03–07.

3

Second, Bolettieri's affidavit relied on a recorded in-person conversation between Defendant and the CW, which occurred on October 13, 2011. *Id.* at ¶ 5. In that conversation, according to the affidavit, Defendant confirmed that he could obtain and sell cocaine and heroin to the CW at $32,000 and $65,000 per kilogram, respectively. *Id.* The CW attempted to purchase $200 of heroin on the spot, but Defendant stated that he was not "keeping nothing" in his residence because he was concerned he was being watched by law enforcement. *Id.* The CW also expressed interest in purchasing pistols, but Defendant indicated he did not have any. *Id.* The CW then inquired about Defendant's own gun, but the response was inaudible on the recording. *Id.* In his debriefing, however, the CW revealed that Defendant had replied that he had a firearm on the premises. *Id.*

Third, Bolettieri's affidavit relied on a recorded telephone conversation, which took place between Defendant and the CW on November 2, 2011. *Id.* at ¶ 6. During that conversation, according to the affidavit, the CW placed an order for a kilogram of cocaine and indicated that he would come by Defendant's residence early the next day to pick it up. *Id.* Later that day or sometime the next day, Defendant confirmed that the drugs would be delivered on November 3, 2011. *Id.*

**The Approved Warrants**

On November 3, 2011, Magistrate Judge Victor Pohorelsky issued an arrest warrant for Defendant and a search warrant for Defendant's first floor apartment and the basement in the same building. Dkt No. 11-mj-1090, ECF Nos. 2 and 3. The warrant authorized law enforcement officers to seize:

> narcotics, firearms, scales, cutting agents, other drug paraphernalia, wrapping materials, including plastic bags and rubber bands, discarded wrappers and other materials used to conceal and transport narcotics, money counters, machines used to package narcotics, surveillance equipment, telephones, SIM cards, currency,

4

> financial records, including rental agreements, utility bills, telephone bills and gas bills, car ownership records, safes, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing cash transactions and prices and/or quantities of narcotics purchased and payments received, correspondence, facsimiles, memoranda, canceled checks, drafts, wire transfer receipts, money orders, notes and notebooks.

*Id.*, ECF No. 8.

**Execution of the Arrest and Search Warrants**

On November 3, 2011, at about 7:40 p.m., the CW entered Defendant's residence. Hearing Tr. 196:6–10, 243:5–244:6. Approximately five minutes later, the CW exited Defendant's residence and signaled to the law enforcement officers waiting outside that there were drugs in Defendant's residence. *Id.* at 196:11, 249:3–12.

Minutes later, the agents entered 144 Kingsland Avenue to execute the warrants. *Id.* at 175:16–183:10, 196:11–13. Once inside the apartment, the agents took several minutes to secure it. *Id.* at 183:6–10; 163:8–16. Neither Defendant nor his wife was found in the apartment. *Id.* at 393:1–9; 406:1–3.

About forty-five minutes to an hour later, Defendant was located in the basement of a neighboring building and arrested. *Id.* at 188:19–25, 296:22–25, 320:5–9, 486:11–19. After being handcuffed, Defendant was taken to Officer Bolettieri's vehicle and placed in the back seat of the car. *Id.* at 185:9–17, 395:3–7. Agent Campbell then showed Defendant his badge, explained that Defendant was under arrest for violating federal narcotics laws, and read Defendant his *Miranda* rights from a DEA Form 13A card, which he carried in his wallet. *Id.* at 186:8–187:10, 395:17–396:3; Hearing Ex. 11.

After being advised of his *Miranda* rights, Defendant made a number of statements over the course of the evening. Hearing Tr. at 397:4–398:2. Many of Defendant's post-arrest statements were made in response to questions by the agents, who asked Defendant numerous times where the cocaine was located while the search warrant was still being executed. *Id.* at 397:4–13, 405:9–15, 500:19–24.

Ultimately, agents searching Defendant's residence found and seized a kilogram of cocaine; a green tub containing heroin, heroin milling equipment, scales, grinders, packaging material, and strainers; OxyContin pills; ammunition; a knife and several pairs of brass knuckles; and about $15,000 in U.S. currency. *Id.* at 398:3–402:11; Hearing Exs. 14–19. The green tub containing heroin and equipment for narcotics trafficking was found in plain view in the living room. Hearing Tr. at 399:2–10. The OxyContin pills were found in a dresser containing women's clothes. *Id.* at 399:23–400:19.

During the execution of the search warrant, Defendant's wife arrived at 144 Kingsland Avenue. *Id.* at 203:16–19, 406:1–6. Although no arrest warrant had been issued for Defendant's wife, Agent Campbell and Officer Bolettieri arrested her as a co-conspirator. *Id.* at 207:17–22, 406:7–13. Both Officer Bolettieri and Agent Campbell informed Defendant that his wife had been arrested. *Id.* at 281:23–24, 406:14–20; 504:3–10. Although Officer Bolettieri and Agent Campbell did not recall whether Defendant's wife was arrested before or after the cocaine was found in Defendant's residence, they testified that no one advised Defendant that his wife would not be arrested, or that she would be released after her arrest, if he cooperated. *Id.* at 207:25–208:3, 281:23–282:4, 406:21–407:1, 503:24–504:2. Defendant's wife was released the day after her arrest without having been formally charged.

**Additional Items Seized from Defendant's Residence by Suffolk County Detectives**

Of the approximately thirteen to fourteen law enforcement officers who executed the search warrant at 144 Kingsland Avenue on November 3, 2011, two were with SCPD: Detectives Jay Burkhardt and Patrick Walsh. *Id.* at 386:22–387:18. These Detectives had learned of Defendant through a burglary investigation. *Id.* at 19:10–22, 63:6–19. Based on the Detectives' interest in Defendant, of which the DEA learned through a law enforcement deconfliction database, the DEA invited the Detectives to assist with the execution of the search warrant. *Id.* at 63:5–14, 476:10–477:9.

During the execution of the search warrant, Detective Walsh assisted with the search of a bedroom. *Id.* at 100:12–22. In the bedroom, Detective Walsh saw in plain view a number of Gucci and Coach handbags, which he believed were relevant to ongoing burglary investigations by the NYPD. *Id.* at 67:24–68:16, 101:16–25. Detective Walsh seized the handbags, as well as an iPad; an envelope labeled "Gucci bag money" that listed names and denominations paid; a box of footwear; boxes of perfume; assorted gift cards and credit cards; and about $75 in U.S. currency. *Id.* at 68:17–75:2; Hearing Ex. 8 (list of items seized); Hearing Exs. 5A, 5B, 5C, 5D (photographs of the items seized). Detective Walsh seized these items based on probable cause and not pursuant to the search warrant. Hearing Tr. at 80:10–81:6, 477:23–478:4. The items were not included in the return on the warrant; instead, Defendant's wife signed a receipt for them. *Id.* at 73:9–74:4, 80:10–81:6; Hearing Ex. 6 (signed receipt).

## ANALYSIS

**I.     Defendant's Motion to Suppress Physical Evidence Under *Franks***

The Fourth Amendment provides: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

7

persons or things to be seized." U.S. Const. amend. IV. In determining whether probable cause to issue a search warrant exists, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). An affidavit in support of an application for a search warrant demonstrates a proper showing of probable cause when it sets forth facts sufficient to enable a reasonably prudent person to believe a search of the areas described within the warrant will uncover evidence of a crime. *Berger v. New York*, 388 U.S. 41, 55 (1967). The quantum of proof necessary to establish probable cause is "only a probability, and not a *prima facie* showing, of criminal activity . . . ." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983) (citing *Spinelli v. United States*, 393 U.S. 410, 419 (1969) and *Beck v. Ohio*, 379 U.S. 89, 96 (1964)).

An issuing judge's determination of probable cause will be upheld if he or she had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (internal editing omitted). A judge's determination of probable cause should be given great deference by a reviewing court. *Id.*; *see also United States v. Nichols*, 912 F.2d 598, 602 (2d Cir. 1990).

However, under the Supreme Court's decision in *Franks v. Delaware*, a warrant must be voided and evidence seized pursuant to that warrant must be suppressed if (1) the supporting affidavit contained statements that were deliberately false or made with reckless disregard for the truth, and (2) the false statements were necessary to the finding of probable cause. *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (quoting *Franks*, 438 U.S. 154, 156 (1978)). To

evaluate whether the false information was necessary to the issuing judge's probable cause determination, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Martin*, 426 F.3d 68, 73–74 (2d Cir. 2005) (quoting *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000)); *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985) ("The ultimate inquiry on a motion to suppress is not—as defendants contend—whether the affidavit contains false allegations or material omissions, but whether after putting such aside, there remains a residue of independent and lawful information sufficient to support probable cause."). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Martin*, 426 F.3d at 73–74 (quoting *Canfield*, 212 F.3d at 718).

Defendant contends Officer Bolettieri's affidavit "misstates crucial conversations contained in the tapes," in particular, whether the recorded conversations included a discussion about whether Defendant had any pistols or a kilogram press. Def.'s Mot. at 3, 6. According to Defendant, neither of these statements is audible on the tapes, and Officer Bolettieri therefore misled the Court by suggesting that he had personally heard these statements while reviewing the tapes. *Id.* Defendant further argues that because of this misstatement, Officer Bolettieri's representation in the affidavit that information provided by the CW had been corroborated by independent evidence "falsely overstated the degree to which [Officer Bolettieri] had corroborated the CW's account." *Id.* at 7. Because of these misrepresentations, according to Defendant, Magistrate Pohorelsky was misled into issuing the warrant. *Id.*

This Court finds, based on the evidentiary hearing and all of the evidence in the record, that the warrant affidavit prepared by Officer Bolettieri did not contain factual allegations that

9

were deliberately false or made with reckless disregard for the truth. In testimony that this Court found credible, Officer Bolettieri testified that although the word "pistols" was not as clear as some of the other words on the tape, he thought that the word sounded like pistols. *Id.* at 383:13–24, 454:4–15. Moreover, Officer Bolettierri credibly testified that when he listened to and transcribed the recording, he had already debriefed the CW and knew that the CW had asked Defendant about buying a firearm. *Id.* at 380:16–24. This debriefing informed his transcription of the recording. *Id.* at 382:20–22. Having reviewed the tape and listened to the hearing testimony, this Court finds that based on the sound of the word, which even Defendant concedes begins with a "p", Def.'s Mot. at 3, and the knowledge available to Officer Bolettierri at the time he made the transcription, it was reasonable for Officer Bolettierri to transcribe the disputed word as "pistols." Consequently, the Court finds no evidence that the transcript or the affidavit contained statements that were deliberately false or made with reckless disregard for the truth.[2] *Martin*, 426 F.3d at 73.

Moreover, even if this Court were to excise the contested factual statements, including the statements about both pistols and a kilogram press, from the warrant affidavit, the "corrected" affidavit would still contain sufficient information to support probable cause. *See Martin*, 426 F.3d at 74. It is undisputed that the warrant affidavit described a November 2, 2011 telephone conversation between Defendant and the CW in which the Defendant agreed to procure one kilogram of cocaine for the CW, to be delivered the following day. Bolettieri Aff. at ¶ 6. When the CW indicated that he wanted to pick up the cocaine at Defendant's house early

---

[2] Because the Court finds that Officer Bolettieri's transcription of the tape and representation to the Court were reasonable and not intentionally or recklessly false, the Court need not address Defendant's contention that Officer Bolettieri improperly used the transcript to falsely overstate the degree to which the CW's account had been corroborated. *See* Def.'s Mot. at 7. In any event, there was ample testimony at the hearing regarding independent corroboration of information provided by the CW. *See, e.g.*, Hearing Tr. 286:23–287:24, 423:3–428:12 (corroborating information by CW that Defendant was present at March 2011 narcotics transaction).

the next day, the Defendant did not object and stated that he would check with his suppliers to make sure they could deliver it to him. *Id.* This information provided a "substantial basis for concluding that a search would uncover evidence of wrongdoing" in Defendant's home on November 3, 2011, rendering issuance of the search warrant proper. *Gates*, 462 U.S. at 236.

Defendant argues that his statement on October 13, 2011 that he was not keeping any drugs in his apartment undermined any finding of probable cause. *See* Def.'s Mot. at 6. This argument fails because the later November 3, 2011 telephone conversation indicated plans for at least temporary possession of narcotics in his home. The fact that Defendant was not regularly keeping drugs in his apartment is not inconsistent with a decision to temporarily keep cocaine at his residence in order to conduct a specific transaction, as evidenced by the November 2, 2011 conversation. Because narcotics were likely to be found on November 3, 2011, issuance of the search warrant was proper.

## II. Defendant's Motion to Suppress Physical Evidence Under the "Flagrant Disregard" Doctrine

In executing a search warrant, law enforcement officers are bound by the scope of the warrant issued. *See United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) ("A search must be confined to the terms and limitations of the warrant authorizing it." (citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971))). When "items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." *Id.* (citing *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976)). However, a court may suppress all of the evidence seized pursuant to a search warrant if the law enforcement agents who executed the warrant acted "in flagrant disregard" of the warrant's terms. *Id.*; *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).

11

Despite these limitations, law enforcement agents who are lawfully present at a search site may seize additional items not specified in the warrant if those items are in plain view and there is probable cause to believe they are connected to criminal activity. *See Kentucky v. King,* 131 S. Ct. 1849, 1858 (2011); *Illinois v. Andreas,* 463 U.S. 765, 771 (1983). This rule applies even if officers engaged in the search expected or hoped that particular items of evidence not mentioned in the search warrant would be found during the search. *King,* 131 S. Ct. at 1858; *Horton v. California,* 496 U.S. 128, 138–39 (1990).

In this case, Defendant argues the search team exceeded the bounds of the search warrant by seizing handbags as part of a burglary investigation during what was supposed to be a search for narcotics. However, Defendant does not dispute—nor could he—that the SCPD officers were lawfully present at Defendant's residence as part of the team that executed the search warrant; the search warrant was addressed to "any authorized law enforcement officer." Nor does Defendant dispute that the seized items were stolen, that the SCPD officers had probable cause to believe the items were stolen, or that the items were in plain view. Because the SCPD officers were lawfully present in Defendant's apartment, their seizure of apparently stolen designer handbags and related items, which were in plain view in the apartment bedroom and which were believed to be relevant to an ongoing burglary investigation, did not violate the Fourth Amendment.[3]

---

[3] Defendant also argues that "the agents in this case acted in bad faith in exceeding the bounds of the warrant . . . [by] returning to the premises the next day and seeking to intimidate Mr. Serrano's family into allowing a second search for evidence unrelated to drug trafficking." Def.'s Mot. at 7. However, this Court credits the testimony in the record that NYPD officers, after learning of the execution of the search warrant, independently decided to visit Defendant's residence on November 4, 2011 to try to gain the consent of Defendant's wife to conduct a separate search for evidence related to an ongoing burglary investigation. Hearing Tr. at 8:18–22, 22:22–26:7, 48:8–23. Conversely, this Court does not credit the Defendant's self-serving declaration that he overheard law enforcement officers decide to send in NYPD police to conduct a second search for evidence related to burglaries. *See* Decl. of Isfrain Serrano ("Serrano Decl."), Dkt. 11-cr-805, ECF No. 20, at ¶ 10; *United States v. Thompson,* 10-CR-94, 2010 WL

## III. Defendant's Motion to Suppress His Post-Arrest Statements

Defendant moves to suppress his post-arrest statements on the grounds that he was not advised of his *Miranda* rights and that he was involuntarily coerced into making statements by the officers, who threatened to arrest his wife if he did not cooperate. In a declaration to this Court, Defendant stated that law enforcement officers repeatedly questioned him about the location of drugs in his home and threatened to arrest his wife if he did not disclose the location of the drugs. Serrano Decl. at ¶¶ 4–5. Defendant states he was not provided with *Miranda* warnings until after he had been questioned and made statements in response to those questions. *Id.* at ¶¶ 6–7. Defendant did not testify at the suppression hearing and was not subject to cross-examination.

"To prove a valid [*Miranda*] waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Male Juvenile*, 121 F.3d 34, 40 (2d Cir.1997) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A statement from a defendant is therefore inadmissible if procured by threat of unlawful action against a family member. *See, e.g., Rogers v. Richmond*, 365 U.S. 534 (1961) (reversing lower court's conclusion that defendant's confession was voluntary despite threat to bring defendant's wife in for questioning). If, however, the threat could be lawfully executed—where, for example, officers have probable

---

3069668, at *5 (S.D.N.Y. July 29, 2010) (Rakoff, J.). This Court finds that the November 4, 2011 visit by NYPD officers was independent of the execution of the search warrant on November 3, 2011. Therefore, there is no basis for suppression of the evidence seized on November 3, 2011.

13

cause to arrest the defendant's family member—there is no coercion and any statements made by a defendant pursuant to that threat are admissible. *See, e.g., Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

Here, although Defendant submitted a declaration in which he stated he was not advised of his *Miranda* rights, the Court rejects his claims as not credible in the face of consistent, detailed, and credible live testimony from Agent Campbell that he advised Defendant of his *Miranda* rights. *See United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999) (Rakoff, J.) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if he declines to testify at the [suppression] hearing."). As noted above, Agent Campbell testified that he showed Defendant his badge, explained that Defendant was under arrest for violating federal narcotics laws, and read him his *Miranda* rights from a DEA Form 13A card, which he carried in his wallet. *Id.* at 186:8–187:10, 196:23. Officer Bolettieri corroborated that Defendant had received his *Miranda* warnings. 395:17–396:3. Based on this record, the Court finds that Defendant was properly read his *Miranda* rights before he made any statements, and therefore that suppression of his post-arrest statements is not warranted.

This Court also rejects Defendant's claim, supported only by his written declaration, that his statements were coerced by the officers' purported threats to arrest his wife. This Court credits the testimony of Agent Campbell and Officer Bolettieri that although they informed Defendant that his wife had been arrested, they never suggested that, in return for Defendant's cooperation, they would not arrest her or would release her after she was arrested. Hearing Tr. at 207:25–208:3, 281:23–282:4, 406:14–407:1, 503:24–504:10. Further, the Court finds there was probable cause to arrest Defendant's wife as a co-conspirator based on the 1) discovery of evidence of narcotics trafficking in the living room of her apartment, 2) discovery of OxyContin

pills in a drawer with women's clothing, and 3) fact that, prior to the day of Defendant's arrest, the agents had significant and detailed evidence that she had served as a lookout for Defendant. *Id.* at 204:7–205:13, 399:23–400:19, 407:2–5. Because there was probable cause to arrest Defendant's wife, Defendant's statements were not coerced as a matter of law and there is therefore no basis to suppress his statements.

### IV. Conclusion

For all of the reasons described above, Defendant's motion to suppress physical evidence recovered from his home and statements made following his arrest is denied in its entirety.

**<u>SO ORDERED</u>**

Dated: Brooklyn, New York
April 8, 2013

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge